John CURRY, Jr., et al., Plaintiffs,

v.

ASSOCIATES FINANCIAL SERVICES, Defendant.

THORP DISCOUNT INC. OF OHIO, Plaintiff,

v.

Winfield Scott DULANEY, et al., Defendants.

Robert Ray FISHER, fdba Fisher Trucking, et al., Plaintiffs,

v.

LIBERTY LOAN CORPORATION, Defendant.

PUBLIC FINANCE CORPORATION, Plaintiff,

v.

Stephen WILSON, et al., Defendants.

Civ. A. Nos. C80–1436A, C80–1871A, C80–1946A, and C80–2179A.

United States District Court, N. D. Ohio, E. D.

May 29, 1981.

Jacob L. Reich, Frank E. Steel, Jr., Carl Hirsch, Akron, Ohio, John W. Ergazos, Canton, Ohio, for plaintiffs.

Brian A. Bash, Cleveland, Ohio, Carl Hirsch and Terrence J. Steel, Akron, Ohio, Carl E. Forrer, Orville, Ohio, for defendants.

## ORDER

CONTIE, District Judge.

The Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549 (hereinafter referred to as the Reform Act), was enacted primarily to face the realities of contemporary commercial and consumer financial practices by modernizing both the substantive and procedural aspects of the bankruptcy laws. These appeals call into question the construction, retroactivity, and constitutionality [1] of the Reform Act's lien avoidance provision, 11 U.S.C. § 522(f).[2] Each of the above captioned cases is an appeal from the United States Bankruptcy

---

1. Pursuant to 28 U.S.C. § 2403 the United States Attorney was notified that in each appeal the constitutionality of 11 U.S.C. § 522(f) is drawn into question. The government has declined to intervene.

2. The Reform Act, Title I, § 101, codifies and enacts the substantive law relating to bankruptcy as title 11 of the United States Code. 92 Stat. 2549.

Court for the Northern District of Ohio.[3] These cases were consolidated to resolve here the issues of law each has in common with the other. *See* Fed.R.App.P. 3(b); Fed.R.Civ.P. 42(a).

## I.

The significant questions these cases present on appeal to this Court for resolution may be synopsized as follows. First, does the lien conservation provision of the federally authorized Ohio exemption statute restrict the availability of exemptions from the bankrupt's estate and ultimately lien avoidance under the federal bankruptcy laws? Second, does the federal lien avoidance provision retrospectively reach pre-enactment consensual liens without violating the taking clause of the fifth amendment to the federal Constitution? The Court answers the first question in the negative and the second question in the affirmative.

The relevant facts and procedural aspects of each of the four above captioned cases follow the same paradigm. Before either the Reform Act's enactment date, November 6, 1978, or the effective date, October 1, 1979, a nonpossessory, nonpurchase-money security interest in the debtor's household and personal goods was taken by the creditor. None of the cases involve liens created after the enactment date but before the effective date. After the effective date of the Reform Act, the debtor filed in this District a voluntary chapter VII petition in bankruptcy.

Upon application the debtor made pursuant to 11 U.S.C. § 522(f), which allows the debtor to avoid liens in exempted property, the bankruptcy court ordered the creditor's lien avoided. The creditor perfected an appeal to this Court, essentially arguing that the lien avoidance provision cannot, for a variety of reasons, reach consensual liens created prior to both the enactment date and the effective date of the Reform Act.

## II.

Exemption statutes bring into focus the conflict between creditor rights and the subsistence needs of the debtor. It does not serve the public interest to enforce the expectations of the creditor at the expense of making the debtor a ward of the state. *See* H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 126 *reprinted in* [1977] U.S.Code Cong. & Ad.News, pp. 5787, 5963, 6087. The future inability of the debtor to satisfy the obligation and the possibility of ultimate discharge in bankruptcy are risks routinely assumed by the creditor. Often, these risks are mitigated and the creditor attempts to protect its interest by securing payment of the obligation with a consensual lien on the debtor's real or personal property. A security interest may be taken in property with an unencumbered fair market value sufficient to protect the creditor's interest and satisfy the debtor's obligation. There are also instances, however, where the lienholder is undersecured but nonetheless executed the security agreement for reasons unrelated to acceptable commercial practices.

In the area of consumer loan transactions, the loan made to the individual may be accompanied by a security agreement covering the debtor's household goods and other personal belongings. Congress has found that this practice is generally unconscionable.[4] Household goods and personal

---

**3.** A transition period was established to assess the needs of the new bankruptcy system. This transition period for the Reform Act began on October 1, 1979 and ends on March 31, 1984. Pub.L. No. 95–598, Title IV § 404(b), 92 Stat. 2683. As one of three possible appellate avenues during the transition period, § 405(c)(1)(C), allows appeal to be taken "to the district court for the district in which the bankruptcy judge sits." 92 Stat. 2685.

**4.** Congressional perception of this problem and proposed remedy is found in H.R.Rep.No.95–

595, 95th Cong., 2d Sess. 127 *reprinted in* [1977] U.S.Code Cong. & Ad.News 5963, 6088:

Frequently, creditors lending money to a consumer debtor take a security interest in all of the debtor's belongings, and obtain a waiver by the debtor of his exemptions. In most of these cases, the debtor is unaware of the consequences of the forms he signs. The creditor's experience provides him with a substantial advantage. If the debtor encounters financial difficulty, creditors often use threats of repossession of all of the debtor's

belongings are highly depreciable items and will invariably have a low resale value insufficient to satisfy the creditor's interest. Nonetheless, a consensual lien is taken on these items merely to create leverage. The transaction is structured not to secure payment by the ultimate liquidation of the creditor's security interest in the encumbered property, but by the threat of taking possession of these items away from the debtor. It is a threat that the creditor never intends to carry out.

Almost without exception, the costs associated with taking possession and selling the items will not be covered by the return. The undersecured creditor, however, uses the threat of taking possession to induce the debtor to make payment. The debtor must either pay or face the prospect of losing household goods and personal belongings that have a replacement value far in excess of their depreciated fair market value.

The leverage situation was perceived by Congress as a frequent occurrence that threatened the overriding goals of the federal bankruptcy laws. Within the design of the Reform Act are statutory provisions protecting in a meaningful way the fresh start of the bankrupt. 11 U.S.C. § 522(b) allows an individual debtor to exempt property from the estate that is either specified under federal bankruptcy law or otherwise provided for under a comparable state statute.[5] Section 522(b) also gives the state the prerogative of opting out of the federal exemptions by enacting its own exemption law.

To "protect[ ] the debtor's exemptions, his discharge, and thus his fresh start, ... [t]he debtor may avoid ... to the extent that the property could have been exempted in the absence of the lien ... a nonpossessory, nonpurchase-money security interest in certain household and personal goods."[6] This power to avoid liens is contained in 11 U.S.C. § 522(f).[7]

---

household goods as a means of obtaining payment.

In fact, were the creditor to carry through on his threat and foreclose on the property, he would receive little, for household goods have little resale value. They are far more valuable to the creditor in the debtor's hands, for they provide a credible basis for the threat, because the replacement costs of the goods are generally high. Thus, creditors rarely repossess, and debtors, ignorant of the creditors' true intentions, are coerced into payments they simply cannot afford to make.

The exemption provision allows the debtor, after bankruptcy has been filed, and creditor collection techniques have been stayed, to undo the consequences of a contract of adhesion, signed in ignorance, by permitting the invalidation of nonpurchase money security interests in household goods. Such security interests have too often been used by overreaching creditors. The bill eliminates any unfair advantage creditors have.

**5.** Section 522(b) provides in relevant part as follows:

Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate either—

(1) property that is specified under subsection (d) of this section, unless the State law that is applicable to the debtor under paragraph (2)(A) of this subsection specifically does not so authorize; or, in the alternative, (2)(A) any property that is exempt under Federal law, other than subsection (d) of this

section, or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180-day period than in any other place....

**6.** S.Rep.No. 95–989, 95th Cong., 2nd Sess. 76, *reprinted in* [1977] U.S.Code Cong. & Ad.News 5787, 5862.

**7.** Section 522(f) provides in relevant part as follows:

Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

....

(2) a nonpossessory, nonpurchase-money security interest in any—

(A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;

(B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or

(C) professionally prescribed health aids for the debtor or a dependent of the debtor.

## III.

■ The language and congressional history of the Reform Act's exemption provision, while expressing a federal interest in insuring that the debtor retain sufficient possessions after the bankruptcy to embark upon a fresh start, acknowledges that it may be more appropriate for the state to set exemption levels that are responsive to the economics of the locale. The state's prerogative to opt out of the federal exemptions must be explicit in the local law that embodies the state exemptions. *See* 3 Collier on Bankruptcy ¶ 522.04, at 522–11 (15th ed. 1980). A state cannot merely authorize that the federal exemptions are not available; there also must be concomitant state exemptions sufficient both to protect the debtor from destitution and to provide the basic necessities that will allow the debtor to embark upon a fresh start.[8]

Ohio has recently amended its exemption laws.[9] The amendment parts from its predecessor by raising the ceiling on exemptions and broadening the types of property covered.[10] Within the amended exemption statute Ohio has exercised its prerogative and does not authorize its state debtors to take the federal exemptions under the Reform Act. Ohio Rev.Code § 2329.662 (Page Supp.1980). Also, the Ohio statute provides

that no exemption shall "affect or invalidate any . . . security interest or pledge of any personal property, or any lien created thereby." *Id.* at § 2329.661(C).

The creditor-appellants contend that, because Ohio law does not allow exemptions for encumbered personal property, the bankrupt is not entitled to such exemptions under federal law. In short, it is argued that the encumbered personal property is not exempt under the applicable state law and therefore cannot be exempt from the bankrupt's estate under 11 U.S.C. § 522(b). Consequently, it is further maintained that the federal lien avoidance provision is not available as there is no exemption to which the bankrupt is entitled.[11] This construction of the relationship between the Ohio exemption statute and the Reform Act is unsupportable.

The Ohio exemption statute plays a dual role. Exemptions set a minimum level of protection for Ohio debtors facing (1) the execution of judgments in state court and (2) proceedings in federal bankruptcy court. Ohio law further provides that exemptions will not impair, *inter alia*, liens on personal property. This is a perfectly legitimate policy decision for the state to make within the context of the operation of the exemption statute in state courts. The credit industry

---

**8.** There is strong evidence that Congress intended that meaningful state exemptions be available to the bankrupt if the state opted out of the federal exemptions. Section 522(b) adopts

the position that there is a Federal interest in seeing that a debtor that goes through bankruptcy comes out with adequate possessions to begin his fresh start. Recognizing, however, the circumstances do vary in different parts of the country, the bill permits the States to set exemption levels appropriate to the locale, and allows debtors to choose between the State exemptions and the Federal exemptions provided in the bill. Thus, the bill continues to recognize the States' interest in regulating credit within the States, but enunciates a bankruptcy policy favoring a fresh start.

H.R.Rep.No. 95–595, 95 Cong., 2d Sess. 126, *reprinted in* [1977] U.S.Code Cong. & Ad.News 5963, 6087.

**9.** For an analysis of the Ohio revised exemption laws, see Note, 5 U.Day.L.Rev. 461 (1980).

**10.** Ohio law authorizes a category of exemptions that is very similar to the exemptions otherwise available under 11 U.S.C. § 522(d). Both the Ohio and federal exemptions follow the suggestions of the Uniform Exemption Act. The major difference between state and federal law is the maximum value for which an exemption may be taken in a particular item.

**11.** Although not strenuously argued, an impairment of contract issue is raised. U.S.Const., art. 1, § 10. It is suggested that the creditor's contractual rights are impaired because Ohio has increased the ceiling on exemptions. A loan agreement, however, creates no contractual rights in specific property. Any contractual right in property under a security agreement is protected in state court under Ohio Rev.Code § 2329.661(C) (Page Supp.1980). Furthermore, *there can be no claim for impairment of contract* by virtue of state exemptions taken in bankruptcy court, because the Ohio exemptions are available to the bankrupt pursuant to a federal authorization and Congress is not prohibited from impairing contracts.

relies heavily on consensual liens to secure loans with marketable property. Congress "recognize[d] the States' interest in regulating credit within the States, but enunciate[d] a bankruptcy policy favoring a fresh start." H.R.Rep.No. 95–595, 95 Cong., 2d Sess. 126, *reprinted in* [1977] U.S.Code Cong. & Ad.News 5963, 6087.

While the states are permitted not to authorize the federal exemptions but instead make the state exemptions available in bankruptcy proceedings, Congress did not permit the states to exercise any discretion over lien avoidance. Lien avoidance was a congressional response to what was perceived as a nationwide problem. Dragnet security interests in household goods and personal property seriously threatened the rehabilitation of the bankrupt and therefore one of the overriding goals of federal bankruptcy law.

The power of Congress to legislate in the area of bankruptcies is plenary. *See, e. g., Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 192, 4 L.Ed. 529 (1819). Construing the state lien conservation section as also affecting the availability of exemptions to the bankrupt emasculates the federal lien avoidance provision. Under the supremacy clause, U.S.Const., art. VI, cl. 2, any conflict between the state lien conservation provision and the federal lien avoidance provision must be constitutionally resolved in favor of the federal law. The individual debtor in bankruptcy may claim under federal law the Ohio exemptions even though they would not be available to the debtor in state court. The Ohio lien conservation section is inoperative in bankruptcy proceedings and has no effect upon the bankrupt's ability to claim exemptions or avoid liens.

Moreover, nothing in the Ohio statute suggests that the lien conservation provision was intended to have any effect outside the state courts. The Ohio provisions for property exemptions, lien conservation, and opting out of the federal exemptions are each set forth in separate sections. The lien conservation section accommodates the regulation of credit in the state. Because Ohio has opted out of the federal exemption list, the bankrupt may turn as a matter of federal law to the Ohio law as a basis of claiming exempt property. In claiming the state exemptions, the bankrupt is not restricted in federal court and the bankruptcy laws are not curtailed by a lien conservation section that expresses the parochial policies of the state legislature.

## IV.

The steady flow of litigation over the application and constitutionality of section 522(f) of the Reform Act has neither conclusively nor uniformly resolved these issues. The cases fall on either side of these difficult questions. Without squarely confronting the constitutional quandary, some courts have construed section 522(f) as reaching only post-enactment liens. *See, e. g., In re Pierce*, 4 B.R. 671 (Bkrtcy.W.D.Okl. 1980); *In re Malpeli*, 7 B.R. 508 (Bkrtcy.N. D.Ill.1980). This construction is criticized as creating a statutory hiatus in a congressional enactment that generally purports to replace *in toto* the former bankruptcy law. *In re Pillow*, 8 B.R. 404, 407 (Bkrtcy.D.Utah 1981). In those bankruptcy cases construing section 522(f) as reaching pre-enactment liens, the bulk of the case law, which is most ably represented by the proceeding below in the instant appeals, supports the constitutionality of the lien avoidance provision's retrospective application. Nonetheless, there is authority holding that section 522(f) as retroactively applied violates the taking clause of the fifth amendment. *See Rodrock v. Security Industrial Bank*, 642 F.2d 1193 (10th Cir. 1981). This Court holds that section 522(f) constitutionally reaches pre-enactment liens.

## A.

Unless otherwise provided October 1, 1979 is the effective date of the Reform Act. Pub.L.No.95–598, Title IV, § 402(a), 92 Stat. 2682. Specific reference is made to provisions of the Reform Act that take effect on some other date. *Id.* at § 402(b) to (e), 92 Stat. 2682. Neither 522(f) nor any other substantive provision of the Reform

Act is designated for an effective date other than October 1, 1979. Thus it is explicit in the statutory scheme of the Reform Act that any bankruptcy proceeding commenced after the effective date is governed by the substantive provisions of the Reform Act. This construction is further supported by the Reform Act's saving clause, which requires that a case commenced under the former Act shall proceed and the substantive rights of the party shall be determined under the law that would be applicable if the Reform Act had not been enacted. *Id.* at § 403(a), 92 Stat. 2682. The negative implication of the savings clause is that a case commenced after the repeal of the former Act must be governed by the substantive provisions under the Reform Act.

The extensive legislative history revolving around the drafting of the federal lien avoidance provision evinces the intent of Congress to remedy the leverage problem with nonpossessory, nonpurchase-money security interests in household goods and personal property that would otherwise continue to follow the debtor beyond the bankruptcy process. The remedy proposed and ultimately adopted was perceived by Congress as "eliminat[ing]" and not merely preventing in the future "any unfair advantage creditors have". H.R.Rep.No.95–595, 95th Cong., 2d Sess. 127, *reprinted in* [1977] U.S.Code Cong. & Ad.News 5963, 6088. Section 522(f) is therefore a curative answer to the leverage problem.

 Courts are generally disinclined to give retroactive effect to legislation. Fluctuating rules erode the certainty the law endeavors to instill by serving as a guidepost for patterning individual conduct. This broad prudential concern is subordinate to the primary rule of statutory construction that congressional intent must prevail. The reluctance to retroactively apply statutes also emerges from the attitude that legislation should be construed to avoid constitutional infirmities and judicial intrusion into legislative policy making. It is through judicial construction, not judicial revision of a statute that constitutional questions may be avoided. *See United States v. Thirty-Seven Photographs,* 402 U.S. 363, 368–69, 91 S.Ct. 1400, 1404–05, 28 L.Ed.2d 822 (1971). A court cannot refuse to acknowledge the retroactive application Congress clearly intends merely to avoid resolving a constitutional question. *Cf. Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (federal legislation that is clearly intended to have a retrospective scope subjected to constitutional scrutiny under the taking clause).

The Reform Act and relevant legislative history render inescapable the conclusion that the federal lien avoidance provision is retroactive and reaches preenactment liens. *See Rodrock v. Security Industrial Bank, supra.* A retroactive construction is inevitable and therefore submits section 522(f) to constitutional scrutiny under the taking clause of the fifth amendment.

### B.

The precise constitutional question raised in the context of this appeal is whether the application section 522(f) to pre-enactment liens constitutes a taking of private property for public use and without just compensation.

In promulgating the Reform Act, Congress exercised its constitutional authorization to establish uniform bankruptcy laws. *See* U.S.Const., art. I, § 8. To preserve the national credit structure, the bankruptcy laws enter into the creditor-debtor relationship in an attempt to equitably distribute the debtor's estate. The power of Congress to accomplish the task of supervising bankruptcies is pervasive within the limits of the Constitution. "The bankruptcy power, like other great substantive powers of Congress, is subject to the Fifth Amendment." *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935) (footnote omitted) (hereinafter referred to as *Radford* ). The lien avoidance power contained in section 522(f) transfers property values, in the form of a lien, from the creditor to the debtor and thus its constitutional pedigree is assailed under the fifth amendment's taking clause.

In *Radford*, the Supreme Court held that the original Frazier-Lemke Act, which applied only to debts existing at the time the Act became effective, was unconstitutional under the taking clause of the fifth amendment. The original Frazier-Lemke Act permitted a bankrupt farmer to obtain a five year stay of foreclosure proceedings provided he pay a reasonable rent to the mortgagee. During the five year period the creditor's rights were suspended except as to collecting the rent. At the end of the five year period the debtor could purchase the property free and clear by paying a judicially appraised price. Thus the Act scaled the debtor's obligation to the current value of the property.

The Act was held unconstitutional because it effectuated a "taking of substantive rights in specific property." 295 U.S. at 590, 55 S.Ct. at 863. Evidence of a "substantial impairment of security" was found in the Act's legislative history. *Id.* at 595, 55 S.Ct. at 866. Congress itself recognized that the Act substantially impaired security as the Senate modified the House version of the legislation so that it had only retroactive application. Otherwise, it would be impossible for the farmers to borrow in the future.

An amended version of the Frazier-Lemke Act, which only delayed the mortgagee's right to foreclosure, was upheld in *Wright v. Vinton Branch of the Mountain Trust Bank of Roanoke*, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937). On the basis of this case and other decisions wherein legislative alterations on the rights of mortgagees survived constitutional scrutiny, *see, e. g., Wright v. Union Central Life Insurance Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940), those who defend section 522(f) contend that *Radford* has been enervated and is without precedential value.

*Radford* has been neither explicitly nor implicitly overruled,[12] and is the point of departure for analyzing the constitutionality of the federal lien avoidance provision. There remains "the fundamental teaching of *Radford* that Congress may not under the bankruptcy power *completely take* for the benefit of a debtor's rights in *specific property* previously acquired by a creditor." *Rodrock v. Security Industrial Bank, supra,* at 1198 (emphasis added).

It would be impossible for the government to function "if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahone*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). Rarely will congressional exercise of the bankruptcy power not interfere with property interests. *Radford* does not *ex proprio vigore* constitutionally condemn every piece of bankruptcy legislation interfering with a lienholder's rights against property interests, but tailors a fifth amendment analysis that considers whether there has been a "substantial impairment" of "substantive rights in specific property." 295 U.S. 595, 590, 55 S.Ct. 866, 863. The nature of both the "property" and the "impairment" are crucial to the analysis.

■ Taking questions are resolved essentially in an *ad hoc* fashion. *See Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979).

> There is no abstract or fixed point at which judicial intervention under the Taking Clause becomes appropriate. Formulas and factors have been developed in a variety of settings. Resolution of each case, however, ultimately calls as much for the exercise of judgment as for the application of logic.

*Andrus v. Allard, supra* 444 U.S. at 65, 100 S.Ct. at 327 (citations omitted). The salient

---

**12.** The Supreme Court continues to rely upon the holding in *Radford. See, e. g., Armstrong v. United States*, 364 U.S. 40, 44, 80 S.Ct. 1563, 1566, 4 L.Ed.2d 1554 (1960).

The *Radford* case has also found its way into the annals of the Reform Act's legislative history as an acknowledgement in section 522(c) of

the constitutional protection afforded the enforcement of valid liens. *See* S.Rep.No.95–989, 95th Cong., 2d Sess. 75, *reprinted in* [1978] U.S.Code Cong. & Ad.News 5787, 5862; H.R. Rep.No.95–595, 95th Cong., 2d Sess. 361, *reprinted in* [1978] U.S.Code Cong. & Ad.News 5963, 6317.

factors that focus the analysis are "the characture of the government action, its economic impact, and its interference with reasonable investment-backed expectations." *Puneyard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980).

### 1.

Not all economic harms "interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes." *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 125, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Congress has determined that a nonpossession, nonpurchase-money security interest in certain depreciable items of household goods and personal property are created primarily with the creditors' expectation that it will provide leverage to coerce payment, not security for the underlying obligation. The categories of property that are generally the target of the creditor's contract of adhesion are specifically enumerated in section 522(f). These items have little value other than in the context of the personal use of the debtor.

Generally, the singular motive behind the creditor's desire to execute the security agreement on section 522(f) articles is in its utility as leverage, not its economic value.[13] The note and the security agreement are executed without the creditor ever seeing property. Both parties know that the fair market value of the collateral is far below the amount of the note. From this unsecured position, the only expectation of the creditor beyond a contract right is that the debtor will make the monthly payment if the creditor threatens to take possession.

The resale value of section 522(f) articles may be described as "essentially a matter of reasoned speculation that courts are not especially competent to perform." *Andrus v. Allard, supra* 444 U.S. at 66, 100 S.Ct. at 327. Congress, however, has given the matter serious consideration and apparently views section 522(f) liens as investing little substantive value. This view perhaps best explains the reference to the *Radford* case in the legislative history accompanying subdivision (c) of section 522.[14] The reference suggests that the character of liens on section 522(f) articles is constitutionally distinguishable from other valid liens.

Finally, the security agreement will often include a dragnet, boilerplate clause purporting to broadly cover all household goods and personal property at the debtor's premises. Typically, any other articles included in the security agreement are listed upon the unverified word of the debtor in a nondescript fashion and without reference to a serial or model number.[15] That the rights acquired under such a security agreement are not in specific property additionally demonstrates that the legitimate expectations of the overreaching creditor are not substantive.

The creditor cannot reasonably expect to claim a property interest under the taking clause by exalting the form of the transaction over its substance. The federal lien avoidance provision is narrowly drawn and it defies logic and sound judgment to conclude that there is a reasonable investment-backed expectation in the limited class of highly depreciable articles enumerated in section 522(f) sufficient to trigger a cognizable property interest. The interest created by security agreements covering section 522(f) articles do not fall within the conception of property embodied in the taking clause of the fifth amendment.

---

**13.** Certainly there are creditors who take section 522(f) liens for legitimate commercial purposes. Indeed, few laws can perfectly match a trait with the mischief they seek to eradicate. Any statutory enactment will to some degree be over-inclusive, under-inclusive, or both. There has been no showing in this case and it does not otherwise appear that the federal lien avoidance provision is unconstitutionally over-inclusive.

**14.** See note 12 *supra.*

**15.** For example, the security agreements that are a part of the record in this appeal list collateral in the following fashion: white range, zenith stereo, hotpoint dryer, white table, 4 speed fan, flower stand, etc.

### 2.

■ Whatever the character of the interest that the creditors may claim to have in section 522(f) property, the federal lien avoidance provision does not substantially impair it. The avoidance power covers only the value of the exemption. The creditor may still enforce the value of the lien that exceeds the amount of the exemption. *See* 3 Collier on Bankruptcy ¶ 522.29[1], at 522–68 (15 ed. 1980). Unlike the complete destruction of the creditors' rights under the mortgage in *Radford*, the creditor retains the security interest in the property that exceeds the amount of the exemption.[16]

The ability of the creditor to enforce the retained security interest will hinge on the sufficiency of the collateral in the first instance and not the operation of section 522(f). In this sense the lien avoidance power is not a "taking," but can more accurately be described as a constitutionally permissible "interference ... from ... [a] public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central, supra* 438 U.S. at 124, 98 S.Ct. at 2659.

### IV.

The Ohio lien conservation provision does not follow into bankruptcy the debtor claiming state exemptions. Also, the debtor filing under the Reform Act may avoid preenactment liens to the extent allowable under section 522(f). The creditor has no fifth amendment "property" interest in section 522(f) articles. Nor is the limited avoidance power a "taking."

The orders by the bankruptcy courts allowing the avoidance of liens under 11 U.S.C. § 522(f) are hereby affirmed.

IT IS SO ORDERED.

16. In *Rodrock v. Security Industrial Bank*, 642 F.2d 1193 (10th Cir. 1981), section 522(f) was construed as reaching pre-enactment liens and held unconstitutional under the taking clause. The court concluded without further elaboration that under the circumstances of the case section 522(f) accomplished "a complete taking of the secured creditors' property interests."

In that particular case, the creditors may have been unable to enforce the liens because the value of the collateral did not exceed the amount of the exemptions. But it is the undersecured status of the creditor that renders the liens completely unenforceable, and not the lien avoidance power of section 522(f).