# ANDRUS, SECRETARY OF THE INTERIOR, ET AL. *v.* ALLARD ET AL.

No. 78–740.   Argued October 1, 1979—Decided November 27, 1979

BRENNAN, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. BURGER, C. J., concurred in the judgment.

*Harriet S. Shapiro* argued the cause for appellants. With her on the briefs were *Solicitor General McCree, Assistant Attorney General Moorman, Robert L. Klarquist,* and *Edward J. Shawaker.*

*John P. Akolt III* argued the cause for appellees. With him on the brief was *John P. Akolt, Jr.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The Eagle Protection Act and the Migratory Bird Treaty Act are conservation statutes designed to prevent the de-

struction of certain species of birds.[1]   Challenged in this case is the validity of regulations promulgated by appellant Secretary of the Interior that prohibit commercial transactions in parts of birds legally killed before the birds came under the

---

[1] The Eagle Protection Act, § 1, 54 Stat. 250, as amended, as set forth in 16 U. S. C. § 668 (a), provides in pertinent part:

"Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in this subchapter, shall knowingly, or with wanton disregard for the consequences of his act take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner any bald eagle commonly known as the American eagle or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to this subchapter, shall be fined not more than $5,000 or imprisoned not more than one year or both: . . . *Provided further,* That nothing herein shall be construed to prohibit possession or transportation of any bald eagle, alive or dead, or any part, nest, or egg thereof, lawfully taken prior to June 8, 1940, and that nothing herein shall be construed to prohibit possession or transportation of any golden eagle, alive or dead, or any part, nest, or egg thereof, lawfully taken prior to the addition to this subchapter of the provisions relating to preservation of the golden eagle."

The Migratory Bird Treaty Act, § 2, 40 Stat. 755, as amended, as set forth in 16 U. S. C. § 703, similarly provides:

"Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or eggs of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat. 1702), the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936, and the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment concluded March 4, 1972."

protection of the statutes. The regulations provide in pertinent part:

50 CFR § 21.2 (a) (1978):

> "Migratory birds, their parts, nests, or eggs, lawfully acquired prior to the effective date of Federal protection under the Migratory Bird Treaty Act . . . may be possessed or transported without a Federal permit, but may not be imported, exported, purchased, sold, bartered, or offered for purchase, sale, trade, or barter. . . ."

50 CFR § 22.2 (a) (1978):

> "Bald eagles, alive or dead, or their parts, nests, or eggs lawfully acquired prior to June 8, 1940, and golden eagles, alive or dead, or their parts, nests, or eggs lawfully acquired prior to October 24, 1962, may be possessed, or transported without a Federal permit, but may not be imported, exported, purchased, sold, traded, bartered, or offered for purchase, sale, trade or barter. . . ."

Appellees are engaged in the trade of Indian artifacts: several own commercial enterprises, one is employed by such an enterprise, and one is a professional appraiser. A number of the artifacts are partly composed of the feathers of currently protected birds, but these artifacts existed before the statutory protections came into force. After two of the appellees who had sold "pre-existing" artifacts were prosecuted for violations of the Eagle Protection Act and the Migratory Bird Treaty Act,[2] appellees brought this suit for declaratory and injunctive relief in the District Court for the District of Colorado. The complaint alleged that the statutes do not

---

[2] Appellee L. Douglas Allard was convicted and fined for violating the Eagle Protection Act, 16 U. S. C. § 668 (a), which establishes criminal penalties for unpermitted eagle sales. *United States* v. *Allard*, 397 F. Supp. 429 (Mont. 1975). Appellee Pierre Bovis was prosecuted under the Eagle Protection Act and under the Migratory Bird Treaty Act, 16 U. S. C. § 707, which provides criminal penalties for the unlawful sale of migratory birds. *United States* v. *Bovis*, Nos. 75–CR–63 and 75–CR–66 (Colo. 1975).

forbid the sale of appellees' artifacts insofar as the constituent birds' parts were obtained prior to the effective dates of the statutes. It further alleged that if the statutes and regulations do apply to such property, they violate the Fifth Amendment.[3]

A three-judge court, convened pursuant to 28 U. S. C. § 2282 (1970 ed.),[4] held that because of "grave doubts whether these two acts would be constitutional if they were construed to apply to pre-act bird products," the Acts were to be interpreted as "not applicable to preexisting, legally-obtained bird parts or products therefrom. . . ." App. to Juris. Statement 13a–14a. Accordingly, the court ruled that "the interpretive regulations, 50 C. F. R. §§ 21.2 (a) and 22.2 (a) [are] void as unauthorized extensions of the Migratory Bird Treaty Act and the Eagle Protection Act and [are] violative of the [appellees'] Fifth Amendment property rights." Id., at 14a. Judgment was entered declaring "the subject regulations to be invalid and unenforceable as against the [appellees'] property rights in feathers and artifacts owned before the effective date of the subject statute," and enjoining appellants "from any interference with the exercise of such rights, including the rights of sale, barter or exchange." Id., at 16a–17a. We noted probable jurisdiction. 440 U. S. 905 (1979). We reverse.

## I

Appellant Secretary of the Interior contends that both the Eagle Protection and Migratory Bird Treaty Acts contem-

---

[3] Appellees also alleged that the Migratory Bird Treaty Act and regulations thereunder were unconstitutionally vague and involved an improper delegation of legislative power to the Executive Branch. These allegations were not passed on by the District Court and are not pressed here. We therefore do not address them.

[4] The Secretary contends that appellees' constitutional claims are insubstantial and did not justify convention of a three-judge court. We disagree. See *Goosby* v. *Osser*, 409 U. S. 512 (1973); *Hagans* v. *Lavine*, 415 U. S. 528, 536–538 (1974).

plate regulatory prohibition of commerce in the parts of protected birds, without regard to when those birds were originally taken. Appellees respond that such a prohibition serves no purpose, arguing that statutory protection of wildlife is not furthered by an embargo upon traffic in avian artifacts that existed before the statutory safeguards came into effect.

## A

Our point of departure in statutory analysis is the language of the enactment. See *Southeastern Community College* v. *Davis*, 442 U. S. 397, 405 (1979). "Though we may not end with the words in construing a disputed statute, one certainly begins there." F. Frankfurter, Some Reflections on the Reading of Statutes 16 (1947).

The terms of the Eagle Protection Act plainly must be read as appellant Secretary argues. The sweepingly framed prohibition in § 668 (a) makes it unlawful to "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import" protected birds. Congress expressly dealt with the problem of pre-existing bird products by qualifying that general prohibition with the proviso that "nothing herein shall be construed to prohibit *possession or transportation*" of bald or golden eagle parts taken prior to the effective date of coverage under the Act. (Emphasis supplied.)

In view of the exhaustive and careful enumeration of forbidden acts in § 668 (a), the narrow limitation of the proviso to "possession or transportation" compels the conclusion that, with respect to pre-existing artifacts, Congress specifically declined to except any activities other than *possession* and *transportation* from the general statutory ban. To read a further exemption for pre-existing artifacts into the Eagle Protection Act, "we would be forced to ignore the ordinary meaning of plain language." *TVA* v. *Hill*, 437 U. S. 153, 173 (1978). Nor can there be any question of oversight or drafting error. Throughout the statute the distinct concepts of

possession, transportation, taking, and sale or purchase are treated with precision. The broad proscriptive provisions of the Eagle Protection Act were consistently framed to encompass a full catalog of prohibited acts, always including sale or purchase. See §§ 668 (a), 668 (b), 668b (b). In contrast, the exemptions created were specifically limited to possession or transportation, § 668 (a),[5] taking, § 668a,[6] or taking, possession, or transportation, *ibid.*[7]

That this precise use of terminology was intentional is clear from the legislative history. An explanatory letter from the Department of Agriculture that was adopted in the Senate Report on the bill defines the reach of the Eagle Protection Act to make it unlawful to

> "take, possess, sell, purchase, transport, or otherwise deal with the bald eagle . . . with the proviso to the effect that it will not apply to the *possession* or *transportation* of any such eagle . . . taken prior to the effective date of the bill." S. Rep. No. 1589, 76th Cong., 3d Sess., 1 (1940). (Emphasis added.)

Further, when Congress amended the Eagle Protection Act in 1962 to cover golden eagles, it once again excepted only possession and transportation of pre-existing artifacts from the general ban. 76 Stat. 1246. And it is particularly relevant that Congress has twice reviewed and amended the statute without rejecting the Department's view that it is authorized to bar the sale of pre-existing artifacts.[8] Cf. *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 275 (1974).

---

[5] Exemption for pre-existing artifacts.

[6] Exemption for takings necessary to protect wildlife, livestock, or agriculture from predation.

[7] Exemption for scientific, zoological, or religious needs and, in certain circumstances, for falconry.

[8] In 1962, Congress extended the Eagle Protection Act to cover golden, as well as bald, eagles, 76 Stat. 1246, and in 1972 penalties under the statute were reinforced, 86 Stat. 1064. On each occasion—especially the

The prohibition against the sale of bird parts lawfully taken before the effective date of federal protection is fully consonant with the purposes of the Eagle Protection Act. It was reasonable for Congress to conclude that the possibility of commercial gain presents a special threat to the preservation of the eagles because that prospect creates a powerful incentive both to evade statutory prohibitions against taking birds and to take a large volume of birds. The legislative draftsmen might well view evasion as a serious danger because there is no sure means by which to determine the age of bird feathers; feathers recently taken can easily be passed off as having been obtained long ago.[9]

Appellees argue that even if the age of feathers cannot be ascertained, it is still possible to date the Indian artifacts of which the feathers are a constituent. Thus, they contend that the goal of preventing evasion of the statute could have been achieved by means less onerous than a general sales ban: for example, by requiring documentation and appraisal of feathered artifacts. The short answer is that this legislation is not limited to the sale of feathers as part of artifacts; it broadly addresses sale or purchase of feathers and other bird parts in any shape or form. The prohibitions of the statute were devised to resist any evasion, whether in the sale of feathers as part of datable artifacts or in the sale of separate undatable bird products. Moreover, even if there were alternative ways to insure against statutory evasion, Congress was free to choose the method it found most efficacious and con-

---

latter—the purposes and scheme of the bill were considered. S. Rep. No. 1986, 87th Cong., 2d Sess. (1962); H. R. Rep. No. 1450, 87th Cong., 2d Sess. (1962); S. Rep. No. 92–1159 (1972); H. R. Rep. No. 92–817 (1972). Regulations preventing the sale of pre-existing artifacts had been in force for some time preceding these amendments, see 50 CFR § 6.1 (Cum. Supp. 1944); 50 CFR §§ 11.1 and 11.8 (b) (1964); 50 CFR § 22.2 (1978), although the wording of the 1960 regulation may suggest otherwise, 50 CFR §§ 11.1 and 11.6 (b) (1961).

[9] See Affidavit of Dr. Alan H. Brush, App. 44–46.

venient. "[T]he legislature . . . is authorized to pass measures for the protection of the people . . . in the exercise of the police power, and is itself the judge of the necessity or expediency of the means adopted."[10] *New York ex rel. Silz* v. *Hesterberg,* 211 U. S. 31, 40 (1908).

## B

The fundamental prohibition in the Migratory Bird Treaty Act is couched in language as expansive as that employed in the Eagle Protection Act. Title 16 U. S. C. § 703 provides that

> "[u]nless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful . . . to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export"

protected birds. But the Migratory Bird Treaty Act contains no explicit exception for the possession or transportation of

---

[10] Our reading of the Eagle Protection Act is not shaken by the fact that, until 1959, Alaska was exempted from the strictures of § 668. See 54 Stat. 250, amended by § 14, 73 Stat. 143. The fact that eagles could be taken, possessed, sold, and purchased in the Territory of Alaska in no way undercut the general ban on sales in the 48 States; we do not read the pre-1959 Alaska exemption as a license to sell Alaska eagles in the rest of the country, or vice versa.

We are also unpersuaded by appellees' argument that the Eagle Protection Act does not apply to feathers that have lost their "identities" as elements in artifacts. This contention is bottomed on the statutory use of the word bird "part" instead of bird "product." The distinction between the terms is immaterial: for example, when Congress amended the Migratory Bird Treaty Act to specify that it applied to bird products as well as bird parts, Pub. L. 93–300, 88 Stat. 190, the Senate Report

bird parts obtained before the federal protection became effective: that exception is created by the Secretary's regulation. 50 CFR § 21.2 (1978). Unlike our analysis under the Eagle Protection Act, therefore, reliance upon the negative inference from a narrow statutory exemption for the transportation or possession of pre-existing artifacts is precluded.[11] Nevertheless, the text, context, and purpose of the Migratory Bird Treaty Act support the Secretary's interpretative regulations of that enactment.

On its face, the comprehensive statutory prohibition is naturally read as forbidding transactions in all bird parts, including those that compose pre-existing artifacts. While there is no doubt that regulations may exempt transactions from the general ban,[12] nothing in the statute *requires* an exception for the sale of pre-existing artifacts. And no such statutory exception can be implied. When Congress wanted an exemption from the statutory prohibition, it provided so in unmistakable terms. Cf. 16 U. S. C. § 711.[13]

The structure and context of this enactment—to the extent that they enlighten—also suggest congressional understanding that regulatory authorities could ban the sale of lawfully

---

indicated that the change was a clarification rather than a substantive change in the reach of the law. S. Rep. No. 93–851, p. 3 (1974).

[11] The Migratory Bird Treaty Act, passed in 1918, 40 Stat. 755, predates the Eagle Protection Act by 22 years. Originally the legislation implementing a Migratory Bird Convention between Great Britain (on behalf of Canada) and the United States, the Act now implements similar treaties between this country and other nations. See generally Coggins & Patti, The Resurrection and Expansion of the Migratory Bird Treaty Act, 50 Colo. L. Rev. 165, 169–174 (1979); M. Bean, The Evolution of National Wildlife Law 68–74 (1977).

[12] The § 703 prohibition is, by its own terms, subject to regulatory exception. See also 16 U. S. C. § 704.

[13] "Nothing in this subchapter shall be construed to prevent the breeding of migratory game birds on farms and preserves and the sale of birds so bred under proper regulation for the purpose of increasing the food supply."

taken birds, except where otherwise expressly instructed by the statute. If Congress had assumed that lawfully taken birds could automatically be sold under the Act, it would have been unnecessary to specify in § 711 that it is permissible under certain circumstances to sell game birds lawfully bred on farms and preserves.[14] Furthermore, Congress could not have been unaware that a traditional legislative tool for enforcing conservation policy was a flat proscription on the sale of wildlife, without regard to the legality of the taking. At the time, a number of States, for example, simply prohibited or restricted possession or sale of wildlife during seasons closed to hunting. See *New York ex rel. Silz* v. *Hesterberg, supra,* at 40. Also before Congress was the Canadian law implementing the Migratory Bird Treaty,[15] and that law itself contained a provision barring the purchase, sale, or possession of protected bird parts *"during the time* when the capturing, killing, or taking of such bird, nest, or egg is prohibited by law," 55 Cong. Rec. 5412 (1917).[16] (Emphasis added.) The Canadian sale ban—of which Congress was aware—thus applied not to illegally taken birds, but rather to all protected birds during the season in which hunting was prohibited. Against this background, the absence of a statutory exemption for pre-existing avian artifacts implies that the Migratory Bird Treaty Act was intended to embrace the traditional conservation technique of banning transactions in protected birds, whenever taken.

---

[14] In fact, the Conference Report accepting the floor amendment that became § 711 was actually withdrawn in order to add language indicating that lawfully bred birds could be sold. See 56 Cong. Rec. 8015 (1918); *id.,* at 8130, 8430.

[15] 55 Cong. Rec. 5412–5413 (1917) (Senate); 56 Cong. Rec. 7372 (1918) (House).

Britain entered into the treaty on behalf of Canada.

[16] The Canadian statute indicates that there might be a lawful excuse for possessing or selling birds out of season, but not what such an excuse would be.

Related statutes may sometimes shed light upon a previous enactment. Cf. *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 429 (CA2 1945) (L. Hand, J.). Other conservation legislation enacted by Congress has employed the enforcement technique of forbidding the sale of protected wildlife without respect to the lawfulness of the taking. The Eagle Protection Act is a notable example. The more recent Endangered Species Act of 1973, as originally framed, prohibited the sale of products or parts of endangered species, without an exception for those products legally held for commercial purposes at the time of the Act's passage.[17] See 16 U. S. C. § 1538; *United States* v. *Kepler,* 531 F. 2d 796 (CA6 1976); *Delbay Pharmaceuticals, Inc.* v. *Department of Commerce,* 409 F. Supp. 637, 641–642, 644 (DC 1976); see also H. R. Rep. No. 94–823, pp. 3–4 (1976) (discussing an amendment to the Endangered Species Act). And when Congress has meant to exempt lawfully taken items from the retroactive application of statutory prohibitions, it has taken care to do so explicitly, see 16 U. S. C. § 1372 (Marine Mammal Protection Act of 1972); 16 U. S. C. § 1538 (b) (Endangered Species Act of 1973), or it has specifically amended the statute for that purpose, see 90 Stat. 911, amending 16 U. S. C. § 1539 (Endangered Species Act); 92 Stat. 3760, amending 16 U. S. C. §§ 1538 and 1539 (Endangered Species Act). In contrast, Congress has never established a preexisting-artifacts exception to the Migratory Bird Treaty Act, even though it has amended the statute on several occasions.[18]

---

[17] In 1976, Congress specifically amended the Act to establish a very limited sales exemption for products of animals lawfully owned for commercial purposes before the Act came into effect. Pub. L. 94–359, 90 Stat. 911, amending 16 U. S. C. § 1539. The amendment was circumscribed in scope and merely *authorized* but did not *order* the Secretary of Commerce to grant exemptions for pre-Act animal products.

[18] In arguing the position that the statute prevents only the sale of illegally taken birds, appellees rely upon the language of the 1972 Migratory Bird Convention with Japan, incorporated into the Migratory Bird

We are therefore persuaded that the Migratory Bird Treaty Act empowers the Secretary of the Interior to bar commercial transactions in covered bird parts in spite of the fact that the parts were lawfully taken before the onset of federal protection. We see no indication to the contrary.[19] It follows

Treaty Act in 1974. Pub. L. 93–300, 88 Stat. 190. The Convention provides that "[a]ny sale, purchase or exchange of these [migratory] birds or their eggs, *taken illegally,* alive or dead, and any sale, purchase or exchange of the products thereof or their parts shall . . . be prohibited." (Emphasis added.) But the language of the Convention, like the terms of the other Conventions, does not carry great weight in the interpretation of the statute. There are material variations in the particulars of each of the Conventions, see Coggins & Patti, *supra* n. 11, at 173–174; Bean, *supra* n. 11, at 70–73; it is therefore hazardous to look to any single Convention for definitive resolution of a statutory construction problem. Furthermore, inasmuch as the Conventions represent binding international commitments, they establish *minimum* protections for wildlife; Congress could and did go further in developing domestic conservation measures. See *id.,* at 74–76.

[19] Our interpretation of the statute does not depart from any course of construction adopted by other courts. Although appellees argue that several courts have determined that lawfully taken birds may be sold under the Migratory Bird Treaty Act, we do not read the cases as supporting appellees' position. Two of the cited cases, *United States* v. *Hamel,* 534 F. 2d 1354 (CA9 1976) *(per curiam),* and *United States* v. *Blanket,* 391 F. Supp. 15 (WD Okla. 1975), neither decide nor imply a decision as to the statutory question posed here. Language favorable to appellees in *United States* v. *Aitson,* No. 74–1588 (CA10, July 21, 1975), is merely dictum in an unpublished opinion. Contrast also *United States* v. *Richards,* 583 F. 2d 491 (CA10 1978). *United States* v. *Marks,* 4 F. 2d 420 (SD Tex. 1925), did hold it impermissible to punish the sale of birds taken before the Migratory Bird Treaty Act was passed. But that ruling rested upon the court's view that Congress' authority to regulate the birds must rest wholly upon the treaty rather than the commerce power. Whatever the logic of that ruling, the underlying assumption that the national commerce power does not reach migratory wildlife is clearly flawed. See, *e. g., Hughes* v. *Oklahoma,* 441 U. S. 322 (1979). Thus, only two early District Court cases, both authored by the same judge, sustain the statutory proposition advanced by appellees. *United States* v. *Fuld Store Co.,* 262 F. 836 (Mont. 1920); *In re Informations Under Migratory Bird Treaty*

that the Secretary could properly permit the possession or transportation, and not the sale or purchase, of pre-existing bird artifacts.[20] Accordingly, we disagree with the District Court's interpretation of the Act as inapplicable to pre-existing legally obtained bird parts.

## II

We also disagree with the District Court's holding that, as construed to authorize the prohibition of commercial transactions in pre-existing avian artifacts, the Eagle Protection and Migratory Bird Treaty Acts violate appellees' Fifth Amendment property rights because the prohibition wholly deprives them of the opportunity to earn a profit from those relics.[21]

---

*Act*, 281 F. 546 (Mont. 1922). The cases involved no more than a cursory inquiry into the statute, and we find them unconvincing.

[20] Indeed, heightened restrictions on the sale or purchase of migratory bird parts were appropriate in light of congressional recognition of the danger to wildlife posed by commercial exploitation. The 1960 amendments to the Migratory Bird Treaty Act specifically addressed that problem by stiffening penalties for the taking of protected birds with intent to sell and for the sale of protected birds. 74 Stat. 866; see H. R. Rep. No. 1787, 86th Cong., 2d Sess. (1960); S. Rep. No. 1779, 86th Cong., 2d Sess. (1960).

[21] Although this argument appears to have been cast in the District Court in terms of economic substantive due process, before this Court appellees have used the terminology of the Takings Clause.

The Secretary has raised the question of appellees' standing to assert a takings claim with respect to their artifacts. He asserts that appellees have not clearly stated that they acquired their property interest in the bird artifacts before the sales ban came into force. If they have not, the Secretary argues, then the "value of any artifacts purchased by appellees *after* the effective date of the Act had already been diminished by the applicability of the Act." Brief for Appellants 30. This contention is misplaced. Even assuming that appellees have not sufficiently alleged pre-effectiveness possession, they have standing to urge their constitutional claim. Because the regulation they challenge restricts their ability to dispose of their property, appellees have a personal, concrete, live interest in the controversy. See *Baker* v. *Carr*, 369 U. S. 186, 204 (1962). The

*Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104, 123–128 (1978), is our most recent exposition on the Takings Clause. That exposition need not be repeated at length here. Suffice it to say that government regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase.* "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 413 (1922); see *Penn Central, supra,* at 124.

The Takings Clause, therefore, preserves governmental power to regulate, subject only to the dictates of " 'justice and fairness.' " *Ibid.;* see *Goldblatt* v. *Hempstead,* 369 U. S. 590, 594 (1962). There is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate. Formulas and factors have been developed in a variety of settings. See *Penn Central, supra,* at 123–128. Resolution of each case, however, ultimately calls as much for the exercise of judgment as for the application of logic.

The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather, a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking. At least where an owner pos-

---

timing of acquisition of the artifacts is relevant to a takings analysis of appellees' investment-backed expectations, but it does not erect a jurisdictional obstacle at the threshold. Of course, there is no standing to assert a takings claim by those who are merely employed in selling artifacts owned by others. All appellees, however, may face future criminal prosecutions for violations of the statutes, and that, of itself, suffices to give them standing to litigate their interest in the construction of the statutes.

sesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety. Compare *Penn Central, supra,* at 130–131, and *United States* v. *Twin City Power Co.,* 350 U. S. 222 (1956), with *Pennsylvania Coal Co.* v. *Mahon, supra,* and *United States* v. *Virginia Electric & Power Co.,* 365 U. S. 624 (1961). See also Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165, 1230–1233 (1967). In this case, it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds.

It is, to be sure, undeniable that the regulations here prevent the most profitable use of appellees' property. Again, however, that is not dispositive. When we review regulation, a reduction in the value of property is not necessarily equated with a taking. Compare *Goldblatt* v. *Hempstead, supra,* at 594, and *Hadacheck* v. *Sebastian,* 239 U. S. 394 (1915), with *Pennsylvania Coal Co.* v. *Mahon, supra.*[22] In the instant case, it is not clear that appellees will be unable to derive economic benefit from the artifacts; for example, they might exhibit the artifacts for an admissions charge. At any rate, loss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests. Cf., *e. g.,* Fuller & Perdue, The Reliance Interest in Contract Damages (pt. 1), 46 Yale L. J. 52 (1936).

---

[22] It should be emphasized that in *Pennsylvania Coal* the loss of profit opportunity was accompanied by a physical restriction against the removal of the coal.

Regulations that bar trade in certain goods have been upheld against claims of unconstitutional taking. For example, the Court has sustained regulations prohibiting the sale of alcoholic beverages despite the fact that individuals were left with previously acquired stocks. *Everard's Breweries* v. *Day*, 265 U. S. 545 (1924), involved a federal statute that forbade the sale of liquors manufactured before passage of the statute. The claim of a taking in violation of the Fifth Amendment was tersely rejected. *Id.*, at 563.[23] Similarly, in *Jacob Ruppert, Inc.* v. *Caffey*, 251 U. S. 264 (1920), a federal law that extended a domestic sales ban from intoxicating to nonintoxicating alcoholic beverages "on hand at the time of the passage of the act," *id.*, at 302, was upheld. Mr. Justice Brandeis dismissed the takings challenge, stating that "there was no appropriation of private property, but merely a lessening of value due to a permissible restriction imposed upon its use."[24] *Id.*, at 303. See *Mugler* v. *Kansas*, 123 U. S. 623 (1887).

It is true that appellees must bear the costs of these regulations. But, within limits, that is a burden borne to secure "the advantage of living and doing business in a civilized community." *Pennsylvania Coal Co.* v. *Mahon, supra,* at 422 (Brandeis, J., dissenting). We hold that the simple prohibition of the sale of lawfully acquired property in this

---

[23] It is not significant that the statute considered in *Everard's Breweries* had been passed under the Eighteenth (Prohibition) Amendment. The Court did not suggest that the Amendment gave Congress a special prerogative to override ordinary Fifth Amendment limitations.

[24] Although the beverage owner in *Jacob Ruppert* retained the ability to export his product or to sell it domestically for purposes other than consumption, see 251 U. S., at 303; *Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. 146, 157 (1919), the domestic sales ban was undoubtedly commercially crippling.

No importance should be attached to the fact that the enactment in *Jacob Ruppert* was promulgated pursuant to the war power. But cf. *United States* v. *Central Eureka Mining Co.*, 357 U. S. 155, 168 (1958).

case does not effect a taking in violation of the Fifth Amendment.[25]

*Reversed.*

The Chief Justice concurs in the judgment of the Court.

---

[25] Appellees also briefly argue that the regulations in this case interfere with their right to engage in a lawful occupation. Even if we were inclined to exhume this variant of the theory of substantive due process, it would not be applicable here. Appellees may still sell artifacts that do not consist in part of protected bird products.