**Clifford A. McNULTY, Plaintiff,**

v.

**TOWN OF INDIALANTIC, Defendant.**

**No. 83–545–Civ–Orl–11.**

United States District Court,
M.D. Florida,
Orlando Division.

Dec. 8, 1989.

Stewart B. Capps, Melbourne, Fla., for plaintiff.

F. Scott Pendley, Orlando, Fla., Edward J. Silberhorn, Melbourne, Fla., for defendant.

OPINION

WALTER E. HOFFMAN, Senior District Judge, sitting by designation.

On July 27, 1983, Clifford A. McNulty filed this action alleging a taking of his property by the Town of Indialantic, without just compensation and without due process in violation of his Fifth and Fourteenth Amendment rights. On April 18, 1986, the court granted summary judgment for the defendant. On November 14, 1987, 832 F.2d 1265, the United States Court of

Appeals for the Eleventh Circuit reversed and remanded the case for further proceedings. The trial of this matter was on January 27 and 30, 1989, in the United States District Court for the Middle District of Florida, following which the transcript was prepared and the matter was briefed by counsel. The case is now ready for final decision.

## FACTS

In November 1963, McNulty purchased four oceanfront lots in the Town of Indialantic, paying $25 for each foot of ocean frontage. TR at 89 and 90, P.E. 1. The property is 135 feet wide extending from the Atlantic Ocean on the east to a public street, Wavecrest Avenue, on the west. TR at 91. Only 20 feet of its width lies landward of the bluff of a sand dune. TR at 96. The property is 200 feet in length, abutting a public beach to the north (TR at 86 and 99) and twenty 50–foot privately owned beachfront lots to the south. The privately owned lots are used in conjunction with homes across Wavecrest Avenue. TR at 201–02, 205–06. McNulty's property is comprised primarily of sandy beach and dune vegetation. TR at 169–70.

When purchased, McNulty's lots were not represented on the town's zoning maps. TR at 360–63; D.E. 29, 30. For this reason, permission of the town was required before any structure could be built on the lots. TR at 366. The lots first appeared on the zoning maps in 1967. TR at 363; D.E. 31. Since that time, the lots have been zoned Tourist, a classification which allows the following uses: residential, multiple living units, professional, hotel, motel, clubs and lodges. TR at 93–94; P.E. 25. No habitable structures have ever existed on McNulty's property or north or south along the beach. TR at 172.

In 1971, the town inquired of McNulty about acquiring his property to expand its municipal beach. TR at 100; P.E. 2. The contemplated expansion included other parcels as well. The matter was dropped after the town's offer of $77 per front foot fell short of McNulty's demand for $110 per front foot. TR at 100–103; P.E. 2.

In March 1973, the town adopted ordinance 149, requiring beachfront structures to be set back 50 feet from the mean high water line, or 25 feet from the bluff line of the dunes, whichever distance was greater. TR at 107, 355; P.E. 19. It acted pursuant to Fla.Stat. § 161.052 (1970), which prohibits construction of dwellings within 50 feet of the mean high water line.

In 1978, the town adopted ordinance 10–781, establishing front setbacks for coastal construction. It used the same coastal construction setback line established by the state legislature in 1971. TR at 354–56. Fla.Stat. § 161.053 (1971) prohibited construction seaward of the established line without prior permission, waiver, or variance from the Department of Natural Resources. D.E. 2. All of McNulty's property lies seaward of this line, which runs down Wavecrest Avenue about four feet west of its center. TR at 129.

Variances to the various town zoning ordinances may be granted by the Board of Adjustment with right of appeal to the Town Council.

In 1978, McNulty applied for a variance to allow construction of a single family dwelling on his property. TR at 121; D.E. 32, 33. The Board of Adjustment denied his application. On appeal, the Town Council upheld the denial. TR at 121–22. On appeal of the Town Council's decision, the state Circuit Court struck down ordinance 149 as facially unconstitutional. TR at 122; D.E. 30 and 37. The Florida District Court of Appeal reversed that judgment in 1981, resolving the issue of facial validity in favor of the town. It also held that McNulty's evidence did not make a prima facie showing that his property was taken by unconstitutional application of the ordinance to his particular property. TR at 122; D.E. 37.

In 1981, McNulty reapplied for a variance to construct a single family dwelling. TR at 134–35; D.E. 39 and 39A. Before the Board of Adjustment took action on the request, he withdrew the application. TR at 367. He resubmitted an application to build a two-story 12–unit condominium complex on the property. TR at 191–92.

**606**

On this application, McNulty raised the estimated value of the property with the proposed construction from $80,000 to $600,000. TR at 148, 368–69; D.E. 38, 39. The Board of Adjustment denied the variance, and the Town Council upheld the denial. P.E. 27, 29, and 30.

In this action, McNulty contends that his property has been taken by the town without due process or just compensation in violation of his Fifth and Fourteenth Amendment rights. He alleges that the taking is effected both by the zoning ordinances prohibiting construction on his property and by actions of the town which he says make his property indistinguishable from the adjacent public beach.

In 1974, the town widened Wavecrest Avenue with parking on both sides of the street in front of McNulty's property and south in front of other privately-owned lots. TR at 68–69 and 109. In 1982, the town placed parking meters at the spaces in front of McNulty's property. TR at 71; P.E. 24. In 1984, the town responded to McNulty's complaints about trespassers by erecting a fence in front of his property. TR at 65–66.

McNulty contends that, as a result of the town's actions, his property has no economic value.

## ISSUE

The issue in this case is whether McNulty's property has been taken without due process and without just compensation by virtue of the town's ordinances and actions affecting the property. Resolution of this issue depends on whether the town's actions bear a substantial relationship to a valid public purpose. Even so, its actions could go too far. To make that determination, the court will consider the character of the government action, its economic impact, and its interference with reasonable investment-backed expectations.

## DISCUSSION

The Florida Court of Appeals has held that Indialantic's zoning ordinance imposing setbacks is not facially unconstitutional. *Town of Indialantic v. McNulty*, 400 So.2d 1227 (1981). That decision is res judicata in this action. The question remains, however, whether the zoning is unconstitutional as applied to McNulty's property.

Sufficient Nexus

■ In *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the United States Supreme Court began its analysis of a taking allegation by examining whether a use restriction was "reasonably necessary to the effectuation of a substantial government purpose." 438 U.S. at 127, 98 S.Ct. at 2660.

In *Nollan v. California Coastal Commission*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), however, the Court used strict scrutiny to examine the fit between the challenged regulation and the claimed state interest. It required that the regulation "substantially advance a legitimate state interest." *Nollan*, 483 U.S. at 834, 107 S.Ct. at 3146.

In its discussion of the necessary nexus between the regulation and state interest, the Court recognized that a "broad range of governmental purposes and regulations satisfies these requirements." *Id.* at 835, 107 S.Ct. at 3147. These include open spaces, scenic zoning, landmark preservation, and residential zoning. The Court assumed, without deciding, that preventing congestion on public beaches and protecting the public's ability to see the beach are permissible police power purposes. A restriction or condition on development that furthered those ends, therefore, would be constitutional, even if it required a concession of property rights by the landowner. *Id.* at 835–37, 107 S.Ct. at 3147–48.

In *Nollan*, the Commission conditioned the plaintiffs' building permit on the granting of a public easement across their beachfront property. The Court found that the necessary connection between the regulation and claimed state interest was missing. The easement along the oceanfront neither prevented congestion nor protected against visual barriers. The building restriction was "not a valid regulation of land use but

'an out-and-out plan of extortion'" to obtain an easement. *Id.* at 837, 107 S.Ct. at 3148 (citation omitted).

The present case presents a different situation. The challenged regulation does not attach conditions to building permits but rather prohibits habitable structures within 25 feet of the top of the dune. The town premises this exercise of police power on public safety and general welfare grounds, citing as its goal the preservation of the dune system.

The regulation seeks to avoid the measurable probability that the proposed construction would impair the use of adjacent property and damage the dune line. Experts offered uncontradicted testimony that a project like that proposed by McNulty would deplete and eradicate dune vegetation and cause erosion of the dune and sand on adjacent property. TR at 311–21, 398, 411–52.

The town relies on the legislative intent advanced by the state legislature when adopting the underlying Beach and Shore Preservation Act, Fla.Stat. § 161.053(1) (1979): "it is in the public interest to preserve and protect [the beaches of the state] from imprudent construction which can jeopardize the stability of the beach dune system, accelerate erosion, provide inadequate protection of upland structure and endanger adjacent property and the dune system."

In adopting beach nourishment and erosion control projects, the legislature also have declared in Fla.Stat. § 161.141 (1979) that beach erosion is "a serious menace to the economy and the general welfare of the people of this state" and that the problem has "advanced to emergency proportions."

The town appropriately prohibits construction inconsistent with these stated goals by exercise of its police power. Its restriction of building in the coastal conservation area and its denial of a variance for construction of a 12–unit condominium complex over the dune and sandy beach is substantially related to the advancement of the legitimate interest of public safety and welfare.

McNulty's plans call for insertion of some 200 12–inch concrete pilings into the dune and beach area to support the proposed structure. TR at 242–243. Expert testimony predicts further erosion of the dune by wind currents underneath the structure and as a result of the destruction of dune vegetation, which would be deprived of sunlight and rainfall. TR at 396–99, 400–02. Other evidence showed the effects of harsh weather on coastal roads and residences in other areas where the dune system similarly had been damaged, endangering life and property. TR at 481–88; D.E. 61–A and 61–B.

By limiting construction, this damage is directly prevented, advancing the goal of preserving the dune system. The town's ordinances and actions are sufficiently related to its stated goal, which is a permissible exercise of its police power. If an ordinance is "otherwise a valid exercise of the town's police power, the fact that it deprives the property of its most beneficial use does not render it unconstitutional." *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 592, 82 S.Ct. 987, 989, 8 L.Ed.2d 130 (1962).

In *Nollan,* the court found the restriction was not substantially related to the state interest advanced by the Coastal Commission. The court, therefore, found a taking had occurred without undertaking further analysis. As suggested by the *Nollan* dissent, however, if a sufficient nexus exists between the regulation and police power objective, the court must continue with the takings analysis to see if the regulation goes too far.

*Penn Central Test*

■ The ordinances as applied to McNulty's property also must pass the three-factor *Penn Central* test to insure that they do not go too far and thereby effect a taking. The Court "has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injury caused by public action be compensated by government rather than remain disproportionately concentrated on a few persons." *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659.

Courts, using ad hoc factual inquiries, have identified several significant factors in determining whether a taking has occurred: the character of government action, interference with reasonable investment-backed expectations, and economic impact. *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659.

Economic Impact

Turning to the economic impact of the town's ordinances and activities on McNulty's property, the threshold for finding a taking is the denial of "economically viable use." *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). This phrase should not be read to assure an owner will be able to use property to earn a profit or to produce income. Rather, it assures an owner will be able to make some use of property that economically can be executed.

The Court, in *Williamson Co. Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 190 n. 11, 105 S.Ct. 3108, 3116, 3118 n. 11, 87 L.Ed.2d 126 (1985), used an alternative formulation of whether the property retains "any reasonable beneficial use." The Court, in *Penn Central*, cited earlier authority for the proposition that compensation is required if the challenged restriction made the property *"wholly useless"* so that "the rights of property ... prevail over the other public interest." 438 U.S. at 128, 98 S.Ct. at 2661 (emphasis added) (citation omitted).

To examine this factor, the courts require a "final authoritative determination of the type and intensity of development legally permitted." *MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986). "A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *Id.*

McNulty's 1978 request for a variance to build a single-family home was denied. TR at 121–22. His reapplication in 1981 was withdrawn before the Board of Adjustments had acted on it and was replaced by the application for a variance to build the 12–unit condominium. TR at 134–36, 191–92; D.E. 39 and 39A.

The state statute prohibiting construction of habitable structures seaward of the 30–year seasonal high water line (Fla.Stat. § 161.053(6)(c) (1971)) specifically provides an exception for single-family dwellings if they are not constructed on or seaward of a frontal dune. TR at 312, 474–75. The town's ordinances implementing the state law also provide a variance procedure which McNulty has used unsuccessfully. P.E. 33 at 356–33 through 356–35; P.E. 34 at 264–66.

Denial of McNulty's variance request does not necessarily suggest that all such requests would be denied. Rather, McNulty has failed to present evidence refuting the town's experts on ecological damage and has not advanced any plan aimed at satisfying the town's concerns by minimizing dune damage.

These facts suggest that construction of a single-family dwelling could be permitted under certain circumstances. Even assuming that the town also would deny a variance for a single-family home, however, the existing ordinances allow minor structures to be constructed: walkovers, boardwalks, sand fences, gazebos, a viewing deck, snackbar, stairways and other structures considered expendable under wind and wave forces. P.E. 21 at 7. McNulty certainly could make any of these uses without economic hardship in complying with the ordinances. Further, this court finds that McNulty's property is not without value, finding the defense's expert testimony about valuation (TR at 506–19) more credible than the testimony of McNulty's expert that there is no market for the property (TR at 266–67), and thus that it has only nominal value (TR at 283).

In *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), the Court assumed a taking of all use had occurred as pled in the complaint, leaving resolution of that issue to the court on remand. *Id.* at 313, 107 S.Ct. at 2384. The Supreme Court also left open the possibility that the county could "avoid the conclu-

sion that a compensable taking had occurred by establishing that the denial of all use was insulated as part of the State's authority to enact safety regulations." *First Lutheran* at 313, 107 S.Ct. at 2384. On remand, the California court found that the prohibition against permanent structures in the floodplain did not constitute a taking. The challenged ordinance "did not deny ... 'all use' of the property and the uses it did deny could be constitutionally prohibited under the County's power to protect public safety.... On balance, the public benefits this regulation confers far exceed the private cost it imposes on the individual property owner (especially after factoring in the public benefits this property owner shares).... The fact the zoning restrictions necessary to the preservation of life and health may cause a diminution in the use or economic value of this property does not create an automatic legal entitlement to compensation for that loss of use and value." *First English Evangelical Lutheran Church v. County of Los Angeles*, 210 Cal.App.3d 1353, 258 Cal. Rptr. 893 (1989).

" 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated.... [The] Court focuses rather both on the ... parcel as a whole." *Penn Central*, 438 U.S. at 130–31, 98 S.Ct. at 2662–63. The Court has not found a taking of all economically viable use even where extreme diminution of value or deprivation of a significant property right has occurred.

In *Andrus v. Allard*, 444 U.S. 51, 67–68, 100 S.Ct. 318, 327–28, 62 L.Ed.2d 210 (1979), the Court held that the "simple prohibition of the sale of lawfully acquired property ... does not effect a taking." Rather the bundle of property rights "must be viewed in its entirety." *Id.* at 66, 100 S.Ct. at 327.

While not a land use case, *Andrus* is illustrative of the Supreme Court "taking" analysis. In *Andrus*, federal law prohibited the sale of Indian artifacts composed in part from federally protected birds. *Id.* at 54, 100 S.Ct. at 321. The regulation did not

constitute a taking because it did not wholly deprive the owner of the opportunity to earn a profit. *Id.* at 66, 100 S.Ct. at 327.

[G]overnment regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase.* "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."

*Id.* at 65, 100 S.Ct. at 326 (citation omitted) (emphasis in original).

Though the regulation in *Andrus* denied the most profitable use, the Court did not find that dispositive of the taking issue. "[L]oss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim.... [T]he interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests." *Id.* at 66, 100 S.Ct. at 327.

Because the regulation in *Andrus* did not compel surrender of the artifacts or involve physical invasion, the court held that "denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Id.* at 65–66, 100 S.Ct. at 326–27.

■ Additionally, the government can destroy all economic use if necessary to avoid a public nuisance or nuisance like use. "The public interest in preventing activities similar to public nuisances is a substantial one, which in many instances has not required compensation." *Keystone Bituminous Coal Association v. De Benedictis*, 480 U.S. 470, 492, 107 S.Ct. 1232, 1246, 94 L.Ed.2d 472 (1987).

In *Keystone*, the state acted "to arrest what it perceive[d] to be a significant threat to the common welfare" by prohibit-

ing mining that would cause above-ground structures to collapse. *Id.* at 485, 107 S.Ct. at 1242. The state was "acting to protect the public interest in health, the environment, and the fiscal integrity of the area. That a private individual erred in taking a risk cannot estop the [state] from exercising its police power to abate activity akin to a public nuisance." *Id.* at 488, 107 S.Ct. at 1243.

The Court likened *Keystone* to several other cases where "it was clear that the state's exercise of its police power to prevent the impending danger was justified and did not require compensation." *Id.* at 490, 107 S.Ct. at 1244. It cited with approval the proposition from a case involving a distillery when Kansas had prohibited the manufacture of intoxicating liquor:

> A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit.... Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the state that its use by anyone, for certain forbidden purposes is prejudicial to the public interest.... The power which the States have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals or the safety of the public, is not—and, consistently with the existence and safety of organized society, cannot be—burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by the noxious use of their property to inflict injury upon the community.

*Mugler v. Kansas*, 123 U.S. 623, 668–69, 8 S.Ct. 273, 300–01, 31 L.Ed. 205 (1887).

In these situations, the court does not appear to weigh the economic impact of the restriction on a noxious use. "All property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community." *Mugler*, 123 U.S. at 665, 8 S.Ct. at 299. The cost of permissible restriction on use is a "burden borne to secure 'the advantage of living and doing business in a civilized community.'" *Andrus*, 444 U.S. at 67, 100 S.Ct. at 328.

The Court in *Keystone* explained: "The special status of this type of state action can also be understood on the simple theory that since no individual has the right to use his property so as to create a nuisance or otherwise harm others, the State has not 'taken' anything when it asserts its power to enjoin the nuisance-like activity." 480 U.S. at 491 n. 20, 107 S.Ct. at 1245 n. 20.

In the present case, the town permissibly restricts McNulty from using his property in a way that will injure adjacent property owners and the community at large. The State of Florida has recognized that:

> "coastal areas form the first line of defense for the mainland against both winter storms and hurricanes, that the dunes of coastal areas perform valuable protective functions for public and private property and that placement of permanent structure in these protective areas may lead to increased risks to life and property and increased cost to the public...."

Fla.Stat. § 161.53 (1985). Because of the danger that the proposed construction would pose to others by destroying the dune, the town would be within its police power to prohibit that use, even if it denies all economically viable use.

Investment-backed Expectations

Turning to the deprivation of reasonable investment-backed expectations, the Court traditionally has looked at the existing use of the property as a basis for ascertaining the owner's "primary expectation concerning the use of the parcel." *Penn Central*, 438 U.S. at 136, 98 S.Ct. at 2665. As noted, the Court in *Andrus* specifically eschews serious consideration of future profits and anticipated gains. 444 U.S. at 66, 100 S.Ct. at 327. "Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform." *Id.*

McNulty has made no use of his property since purchasing it in 1963. In 1972, he entered into a contract to sell the property which was never closed. TR at 103–04. In 1978, he made his first application to use the property for a single-family house. TR at 121; D.E. 32, 33. By that time, various regulations restricting its use were already in place. TR at 107, 355; P.E. 19; D.E. 2.

Otherwise, the court has only McNulty's testimony as to what his plans were for the property when he purchased it. TR at 91–92, 165–68. The fact remains, he attempted no use for 15 years. Then the use he proposed to make was specifically precluded by the then existing regulation. Any expectations he may have regarding use of the land are not backed by any investment other than his original purchase.

Subsequent investment in plans, an engineering study, architectural drawings and representations have been done in an attempt to secure an exception to existing regulations or in advancement of this litigation to establish a taking and will not be considered as an investment in the property itself.

The reasonableness of McNulty's expectations concerning development of his property is also undermined by the circumstances of its acquisition and character of surrounding property. McNulty purchased the property in 1963 for $25 a front foot (TR at 90–91) when lots of suitable depth for residential building were selling for $500 a front foot. TR at 508. This disparity surely alerted McNulty to the probability that his property was not suited for all of the same uses that a deeper lot would be. Now he seeks to compare the value of his lot to that of lots where building is possible without encroaching the dune.

Also McNulty points to other structures along the Florida coast that extend over the beach and surf. TR at 92 and 93. None of these are habitable structures, however, and all were constructed in the 1930's and 1940's before beach ecology became an issue of public concern. TR at 190–91.

No construction exists on the Indialantic beach north or south of McNulty's property. TR at 172. McNulty's property is similarly situated to the twenty 50–foot lots to the south along Wavecrest Avenue. TR at 202. All of these lots are used only in conjunction with residences across Wavecrest Avenue. TR at 206.

McNulty may make the same use of his property that these property owners can make. Like them, he has access to and enjoyment of the beach and ocean. The fact that he could make similar use of the adjacent public beach is irrelevant. He also has the right to exclude others from his property, preserving it for his own personal enjoyment. This right of exclusion has been recognized by the Court as "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Nollan,* 483 U.S. at 831, 107 S.Ct. at 3143.

He also may construct minor structures for his own recreational use. P.E. 21. His use of the property is only limited by what he may build there. Inability to use the property for production of an income stream or to make the highest and best use does not render the property without economically viable use.

According to *Penn Central,* a showing of diminution in property value does not, by itself, establish a taking. 438 U.S. at 131, 98 S.Ct. at 2662 (citing instances where no taking occurred though property value was diminished 75 percent and 87½ percent by zoning laws).

McNulty has not shown frustration of his reasonable investment-backed expectations.

Operation in Regulated Environment

"A purchaser who purchases land with notice of statutory impediments to the right to develop that land can justify few, if any, legitimate investment-backed expectations of development rights which rise to the level of constitutionally protected property rights." *Claridge v. New Hampshire Wetlands Board,* 125 N.H. 745, 485 A.2d 287, 291 (1984). "The State cannot be guarantor ... of the investment risks which people choose to take in the face of

statutory or regulatory impediments." *Id.* at 751, 485 A.2d at 291.

In *Claridge,* the New Hampshire court found the landowners were on notice of regulatory impediments because, at the time of purchase, they had some knowledge that they would need approval from a government agency to place fill on their property. *Id.* at 752–53, 485 A.2d at 292. Therefore, they had no legitimate investment-backed expectations of development when harsher regulations were enacted after "the dangers associated with filling wetlands ... recently became widely known." *Id.* at 752, 485 A.2d at 292.

The court observed that the "public policy of the state has recognized the importance of the wetlands and strong regulations to protect wetlands have been enacted. The regulations call for some sacrifices from all." *Id.* at 752, 485 A.2d at 292. In examining whether the burden on the plaintiff was unreasonably onerous, the court determined that the "burden imposed [by denial of a fill permit] is not different in kind from that embodied in the risk which the [plaintiffs] chose to take in buying this lot with notice of regulatory impediments and in waiting to develop the property in the context of growing public concerns about wetland resources." *Id.* at 753, 485 A.2d at 292. The court found no taking.

The present case has striking similarities. McNulty claims a reasonable investment-backed expectation of being permitted to develop his property under the Tourist zoning classification without regard to the subsequent ordinances imposing the setback restriction. The reasonableness of that expectation is undermined by the fact that the land has been subject to land-use regulation since its purchase, and those regulations are subject to change from time to time as circumstances change.

McNulty's property was not included on zoning maps until 1967, four years after he purchased it. TR at 363. At the time of the purchase, the town ordinance required express permission before any development of the property could be undertaken. TR at 366. By relying on the Tourist designa-

tion, therefore, McNulty relies on subsequent change in zoning and is heard to complain of later changes.

The fact of regulation at the time of purchase, however, put McNulty on notice that the property was subject to restrictions on development. By purchasing property with regulatory impediments and waiting to develop it, he took the risk that regulation would become more harsh in the face of increasing concern over dune ecology.

The town could not be expected to anticipate in 1963 what effect storms, construction and erosion would have on the beach, the value of the dune system, and how it would be undermined. The State of Florida statutorily has recognized the importance of the dunes and enacted strong regulations to protect the dune system. Indialantic properly may change its land-use regulations to address these concerns.

As noted in *Andrus,* the burdens imposed on an individual in a regulated environment are often simply the cost of "living and doing business in a civilized community." 444 U.S. at 67, 100 S.Ct. at 328 (quoting *Pennsylvania Coal,* 260 U.S. at 422, 43 S.Ct. at 163 (Brandeis dissenting)).

Character of Government Action

Finally, the character of the government action is a significant consideration in determining whether a taking has occurred. "[A] use restriction on real property may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose, or perhaps if it has an unduly harsh impact upon the owner's use of the property." *Penn Central,* 438 U.S. at 127, 98 S.Ct. at 2661.

In *Penn Central,* the court held that a " 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* at 124, 98 S.Ct. at 2659. The interference in the present case is more fairly characterized as the latter. " 'Government hardly could go

on if to some extent values incident to property could not be diminished without paying for every such change in the general law.'" *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922).

The Court in *Penn Central* recognized that "in a wide variety of contexts, the government may execute laws and programs that adversely affect recognized economic values." 438 U.S. at 124, 98 S.Ct. at 2659. "[I]n instances in which [government] reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, [the] Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests." *Id.* at 125, 98 S.Ct. at 2659.

Zoning laws are a "classic example" of "permissible governmental action even when prohibiting the most beneficial use of the property." *Id.* The Court also recognized that "[l]egislation designed to promote the general welfare commonly burdens some (owners) more than others." *Id.* at 133, 98 S.Ct. at 2664. It rejected the contention that the plaintiff was solely burdened and unbenefitted by the regulation restricting building inconsistent with the landmark law. *Id.* at 134, 98 S.Ct. at 2664.

This theme is repeated in *Keystone* where the court considers "reciprocity of advantage" with regard to the burdens and benefits of a challenged regulation. 480 U.S. at 491, 107 S.Ct. at 1245. "Under our system of government, one of the State's primary ways of preserving public weal is restricting the uses individuals can make of their property. While each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others. These restrictions are 'properly treated as part of the burden of common citizenship.'" *Id.* (citations omitted).

In *Agins,* the Court found no indication that the appellants' 5-acre tract was the only property affected by the open space building restrictions. 447 U.S. at 262, 100 S.Ct. at 2142. It found, therefore, that they "will share with other owners the benefits and burdens of the city's exercise of its police power. In assessing the fairness of the zoning ordinances, these benefits must be considered along with any diminution in market value that [the property owner] might suffer." *Id.*

In the present case, regulations reflecting concern for integrity of the dune system as a line of defense against storms and beach erosion naturally will impact more on beachfront property owners than those inland. They will impact more on those who only own dune land than on those who own buildable land beyond the dune. These facts, however, do not undermine the valid public purpose.

McNulty does not contend that a physical encroachment has occurred, as in *Nollan* where the town required an easement for pedestrian traffic as a condition for granting a building permit. Quite the contrary, the town erected a fence to protect McNulty's land from trespassers and to aid him in his attempt to exclude trespassers. TR at 65–66. Neither does McNulty's evidence show that visitors to the adjacent public beach spill over to his property and occupy his land with the town's approval and encouragement.

Indeed, McNulty enjoys a "reciprocity of advantage" in that the same regulation that keeps him from destroying the dune also prevents adjacent property owners from doing the same. It preserves the dune system to protect McNulty's property from the severe storm damage and erosion that the evidence showed likely would result if the dune system was undermined.

The Takings Clause "has never been read to require the States or the court to calculate whether a specific individual has suffered burdens under this generic rule in excess of the benefits received." *Keystone* 480 U.S. at 491 n. 21, 107 S.Ct. at 1245 n. 21. Therefore, the fact that McNulty may be more burdened than other owners who make a different use or may feel that the burden exceeds the benefit is not dispositive.

Similarly, the Court notes its "hesitance to find a taking when the State merely

restrains uses of property that are tantamount to public nuisances." *Id.* at 491, 107 S.Ct. at 1245. In *Keystone,* the challenged regulation prohibited mining that would cause above-ground structures to collapse.

The Court noted with approval the Court of Appeals's conclusion that no taking had occurred because the act in question was "a legitimate means of 'protect[ing] the environment of the Commonwealth, its economic future, and its well-being." *Id.* at 480, 107 S.Ct. at 1240. It concluded "the character of the government action involved here leans heavily against finding a taking; [the government] has acted to arrest what it perceives to be a significant threat to the common welfare." *Id.* at 485, 107 S.Ct. at 1242.

In the present case, the town advances a safety and general welfare justification for this exercise of police power. That position is supported by the testimony of expert witnesses. TR at 321–24, 440–42, 485–88. That claim has not been controverted by any reliable evidence. McNulty's showing that the proposed project is technologically possible does not answer the town's concern about the damage it will do to the dune system. TR at 226–27, 240–41, 244–48, 408; P.E. 16.

The Court in *Penn Central* also focused on the fact that the government's landmark preservation "neither exploits [the plaintiff's] parcel for city purposes nor facilitates nor arises from any entrepreneurial operations of the city." 438 U.S. at 135, 98 S.Ct. at 2665. The prohibition against building in the airspace above Grand Central Station was "no more an appropriation of property by government for its own use than is ... a safety regulation." *Id.*

This court finds no merit in McNulty's claim that the town ordinances intend to appropriate his property as an extension of the existing public beach. The town's uncontroverted expert evidence about the ecological impact of McNulty's proposal and its tracking of parallel state laws are persuasive and support its claimed police power purpose of safety and general welfare. The regulation, therefore, must be viewed as permissibly advancing those goals without "going too far."

## CONCLUSION

The circumstances of this case, examined in light of applicable law, fail to establish either a lack of sufficient nexus under *Nollan* or a regulation that goes too far under *Penn Central.* Consequently, this court must conclude that no taking has occurred. McNulty may make permissible uses of his property under the existing regulations or satisfy the town that proposed uses will not endanger the dune system or impair the ecological balance. With sufficient assurances regarding construction, the town may choose to grant variances allowing uses not yet proposed by McNulty. The Due Process and Just Compensation guaranteed McNulty by the constitution have not been impaired.

An order is this day being entered granting judgment to the defendant, with taxable costs assessed against the plaintiff.